UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA ZSENYUK,

       Plaintiff,

                                        Case No. 12-14625

vs.                                     HON. GERSHWIN A. DRAIN

KAMPS, INC. *et al.*,

       Defendants.

_____/

## <u>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#29]</u>

**I.    INTRODUCTION**

On October 18, 2012, Plaintiff, Lisa Zsenyuk ("Zsenyuk"), filed the instant employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et. seq.*, ("Title VII") and Michigan's Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2101 *et. seq.*, ("MELCRA"). Zsenyuk alleges Defendants, Kamps Pallets, Inc. ("Kamps") and Bernard M. Kamps ("Mr. Kamps"), discriminated against her based on her gender and religion culminating in her March 22, 2011 termination. Presently before the Court is the Defendants' Motion for Summary Judgment, filed on August 15, 2013. On September 20, 2013, Zsenyuk filed her Response in Opposition and Defendants filed a Reply Brief on October 11, 2013. Upon review of the parties' briefing, the Court concludes that oral argument will not end in the resolution of Defendants' present motion, accordingly, the Court will resolve the motion on the briefs. *See* E.D. MICH. L.R. 7.1(f)(2).

For the reasons that follow, the Court denies Defendants' Motion for Summary Judgment as to both Counts in the Complaint.

II.    **FACTUAL BACKGROUND**

Kamps, a Grand Rapids based company, manufactures and recycles pallets and wooden boxes. Kamps has approximately 600 employees spread out over 10 locations. Mr. Kamps, the owner and CEO of Kamps, has been associated with Kamps since 1973. Mr. Kamps is an active member of the Protestant Reformed Church and takes a traditional view on women in the workplace - believing that a mother's primary role is to be home caring for her husband and children.

Kamps is historically a male dominated corporation. Kamps employs 12-15 salespeople total, and throughout Zsenyuk's ten year employment with the company, she was the only female salesperson. Before being hired by Kamps, Zsenyuk received her a Bachelor of Science degree in Marketing and had ten years of sales experience, including working for Matthews Enterprises ("Matthews"), a pallet selling company bought by Kamps in 2001. When Zsenyuk accepted the salesperson position at Kamps, she signed a noncompete/nonsolicitation clause and entered into an agreement that made her an at-will employee after six months. Zsenyuk was assigned to work out of Kamps' manufacturing facility located in Taylor, Michigan along with salesman Mike McMillan ("McMillan"), who was hired in 2003. Zsenyuk understood that she was being hired to bring in sales for the company and handle her regular accounts.

In 2009, a struggling economy caused virtually all of Kamps salespersons' sales numbers to drop. Overall, Kamps sales dropped 20% in 2009. Kamps admits that Zsenyuk's sales were particularly hit hard given the auto industry losses that affected her Detroit customers and potential market. From 2008 to 2009, Zsenyuk's sales went down 25%, from 2.8 million to 2.1 million. Additionally, in November 2009 Zsenyuk had a baby.

Zsenyuk argues that the birth of her child was a turning point in Mr. Kamps' determination that she was no longer a good fit for his company.

Mr. Kamps was very open about his religious beliefs, particularly in regard to female roles. For instance, the company handbook recognized Sunday as a "day of worship" and free from work. Furthermore, Mr. Kamps repeatedly referred to God and Jesus in writing and quoted scripture and lead prayer during business meetings. Additionally, Mr. Kamps frequently voiced his opinion that mothers should be home raising their children. Multiple employees agreed that Mr. Kamps showed preferential treatment towards those who shared his religious beliefs and attended his church.[1] Zsenyuk is Catholic.

In 2010, while other salespeople were able to recover their losses from the previous year, Zsenyuk's numbers decreased by 26%, from 2.1 to 1.5 million. Mr. Kamps hired Rick Wierenga ("Wierenga"), a friend, fellow church member, and former banker to work as a consultant in the hopes of improving sales. Although Wierenga admitted he had no prior knowledge of pallet sales, he met with Zsenyuk to discuss her work and presumably strategize areas in which she could improve. While Wierenga stated that he thought Zsenyuk was capable, knew the pallet industry, and recognized that her significant decrease in numbers was primarily due to the economic downturn and could take years for her sales to recover, he also assumed Zsenyuk's work would be limited given her "family

---

[1] Zsenyuk regularly met with Timothy Kearly ("Kearly"), plant manager at Kamps' Taylor location, and Bob MacDonald ("MacDonald"), Kearly's boss, for discussions in which favoritism at Kamps on the basis of gender and religion was addressed. In their depositions, Kearly and MacDonald indicated they shared Zsenyuk's observations that Mr. Kamps showed favoritism and preferential treatment on the job toward men that were Protestant Reformed and/or attended his church.

3

situation" and tied her low quotes to maternity leave.[2] Wierenga also questioned whether Zsenyuk had the "desire or ability to attract new business," and recommended that Zsenyuk's and Dave Stout's ("Stout"), another salesperson who was struggling, performance be monitored for the next three months to make sure they were making improvements on sales volume and quoting activity.

Mr. Kamps also assigned Kearly to work closely with Zsenyuk and McMillan and monitor their progress. There is some dispute as to whether or not Kearly gave Zsenyuk and McMillan personal goals for 2011. Defendants argue that Kearly provided personalized goals for both individuals;  a $2,400,000.00 total sales number for Zsenyuk and a $900,000.00 increase for McMillan (whose 2010 numbers were about $3,000,000). Zsenyuk, however, asserts that she was not given a personal goal, but instead a $1,000,000.00 total goal increase was given to the Taylor plant and split equally between Zsenyuk and McMillan.

By March 2011, Zsenyuk was recording approximately $120,000.00 a month, which if continued throughout 2011 would have resulted in $1,400,000.00 in sales for the year, which would have been not only below any goal increase set by Kamps or Kearly, but would have also been Zsenyuk's lowest number to date. However, while Zsenyuk acknowledges her lower sales in 2009-2010, she also argues that she was closing a $2,000,000.00 deal with GM at the time of her termination. Zsenyuk had been working closely with GM, a client she had brought to Kamps, and the day before her termination Zsenyuk was informed by GM via conference call that they were going to go with her for

---

[2] Zsenyuk argues that she never took any maternity leave.

4

a $ 2,000,000.00 contract. Defendants dismiss this sale because it did not go through, but Zsenyuk argues that the fall-through was not because of her, but because when she was terminated the bid was left to Kearly to finish the deal. Kearly, a manager, had no sales experience and failed to complete the sale. Were Zsenyuk permitted to stay at Kamps and follow through on the GM deal she would have made a significant bounce back towards her 2008 sales numbers and would have met and exceeded the $ 2,400,000.00 goal Defendants claim Zsenyuk was assigned for 2011. On March 22, 2011, Mr. Kamps terminated Zsenyuk for poor performance. Zsenyuk argues she was wrongfully terminated based on unlawful gender and religious discrimination.

## III.   LAW AND ANALYSIS

### A.   Standard of Review

Federal Rule of Civil Procedure 56(a) permits a party to:

> [M]ove for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment  if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has affirmed the use of summary judgment and recognized it as an integral part of the fair and efficient administration of justice. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party seeking summary judgment "bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.,*

5

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The burden then shifts to the non-moving party to produce "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968). The evidence presented must be such on which a jury could reasonably find for the defendant; mere denials, unsupported allegations, or speculations will not be enough to meet this burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.    Prima Facie Case under Title VII and MELCRA

Defendants argue that their Motion for Summary Judgment should be granted because Zsenyuk fails to establish a prima facie case of discrimination under Title VII or MELCRA. Title VII prohibits discrimination in the workplace while MELCRA specifically prohibits discrimination based on sex/gender or religion. A plaintiff can inferentially prove discrimination claims under both Title VII and MELCRA by following the burden-shifting framework set forth in *McDonnell-Douglas v. Green*, 411 U.S. 792, 802-05 (1973). Under a *McDonnell-Douglas* analysis, a plaintiff establishes a prima facie case of discrimination if she shows: (1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she suffered an adverse employment action, and (4) she was replaced by a person outside her protected class. *Id.*, *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Alternatively the fourth element may be satisfied by showing that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *Debrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 538, n.8 (2001).

Here, there is no dispute that Zsenyuk is a member of a protected class and she suffered an adverse employment action. Thus, Defendants' maintain Zsenyuk cannot meet the second and fourth elements of her prima facie case; specifically that she was qualified

6

for her position and that she was treated differently than her similarly situated counterparts.

### 1.   Zsenyuk's Qualifications for the Position at Issue

According to the Defendants,  Zsenyuk was not qualified for a salesperson position at the time of her termination. To show "qualification," Defendants argue that Zsenyuk must show that she was "performing at a level which met Defendants' legitimate expectations." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). Because Zsenyuk was terminated for her failure to meet Kamps sales quota, Defendants contend it is impossible for Zsenyuk to be "qualified."

Conversely, Zsenyuk argues that she was very qualified for the position she successfully held for ten years after previously working in sales for ten years and being recruited by her prior company. In response to Defendants' definition of "qualification," Zsenyuk points to Defendants' expectations and asks the Court to consider whether or not they were "legitimate" given the strong circumstantial evidence suggesting the presence of discrimination by Defendants against Zsenyuk.

While Defendants continue to rely on the explanation that Zsenyuk's termination was for poor performance, the figures and circumstances they rely on are not as straightforward as suggested. In 2009 Zsenyuk ranked 4th out of 8 in sales, despite being the salesperson hardest hit by the economic downturn. In 2010, the year that Defendants point out the other salespeople went up in sales while Zsenyuk again experienced a loss, Zsenyuk retained her 4th place rank. Additionally, Kamps sales data omits a significant amount of money that Zsenyuk was responsible for bringing into the company that she is not credited for. For example, Zsenyuk brought in General Motors ("GM") as a valuable client and arranged for

7

Kamps to receive inbound scrap/recycled pallets from GM at no cost. This arrangement was highly lucrative for Kamps, who could resell the restored pallets, however none of the profit was reflected in Zsenyuk's reports.[3] There is ample evidence for the Court to find that Zsenyuk has successfully made a prima facie case of discrimination. Therefore, based on the above considerations, the Court concludes that a question of fact exists as to whether Plaintiff was qualified for her position.

>    2.    Did Zsenyuk's Termination occur under Circumstances giving rise to an Inference of Unlawful Discrimination?

Additionally, a jury could reasonably find that Zsenyuk was treated differently than her male co-workers and that her termination stemmed from a situation of unlawful discrimination. To successfully make this argument, Zsenyuk must show that she was similarly situated to a comparative employee outside her protected class who received more favorable treatment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998), *see also Gielda v. Bangor Twp. Schs.*, 505 Fed. Appx. 550, 555 (6th Cir. 2012). Defendants argue there is no such employee, as McMillan, who also worked at the Taylor site and held the same position as Zsenyuk with the same sales expectations, also had the same supervisor covering the same territory, substantially outperformed Zsenyuk. McMillan increased his sales by 18% in 2010 and averaged $300,000.00 in sales per month in March 2011. Instead, Defendants argue that Zsenyuk was similarly situated to Stout, who was terminated a few weeks before Zsenyuk for similar reasons and who did not receive more favorable treatment than Zsenyuk.

---

[3] Kamps openly admits that GM delivered 15-20 semi trucks full of scrap/recycled pallets each week.

Zsenyuk alternatively contends that her termination occurred under circumstances giving rise to unlawful discrimination because there was a double standard with respect to the sales opportunities she was offered and those offered to her Protestant Reformed, male counterparts. While Zsenyuk acknowledges her decrease in sales numbers, she attributes it to the roadblocks she encountered when attempting to move forward with sales. Specifically, she argues that Mr. Kamps reassigned Zsenyuk's accounts to her male co-workers, only gave leads to male employees, prevented Zsenyuk from expanding her sales territory, and implemented other practices and processes that made it virtually impossible for her to remedy lackluster sales numbers.

When Zsenyuk came to Kamps from Matthews, some of her accounts were taken from her and identified as "house accounts." However, when McMillan was hired two years later, he was given access to Zsenyuk's surrendered accounts as part of his base. Additionally, in 2010 one of Zsenyuk's accounts was taken from her and given to Mr. Kamps' son, a plant manager who was rarely assigned accounts. In 2011, when a new Detroit office was opened, two more of Zsenyuk's accounts, including her largest, were reassigned to a new salesman.

Rather than equally distributing the leads Kamps received across its salespeople, Mr. Kamps permitted two salesmen, Jordan Pipe ("Pipe") and Joel Engelsma ("Engelsma"),[4] to screen the leads and keep the best ones for themselves. Once Pipe and Engelsma were done with the leads, any leads that did make it to the Taylor facility were immediately forwarded to McMillan rather than Zsenyuk. McMillan also received preferential

---

[4] Both Pipe and Engelsma are members of the Protestant Reformed Church.

access to cold call leads and ad inquires that came into the Taylor plant.

While Defendants assert that it is not company policy to require their salespeople to remain within their territory limitations, Zsenyuk's attempts to break outside her assigned Southeast ("SE") Michigan market were repeatedly denied. Not only did Mr. Kamps strike down every sales opportunity Zsenyuk presented that was outside her territory, but he specifically told her that it would be best if she were to stay at home and be closer to her family. Consequently, Zsenyuk lost a key account when the customer began to do packaging out of California rather than Detroit. While male salespeople were allowed and encouraged to broker deals in other states, Mr. Kamps told Zsenyuk not to pursue outside opportunities and leave the out-of-state markets to the men who could do a better job handling such circumstances and travel, especially when required to stay over night.

Zsenyuk even faced limitations within SE Michigan. Each time Kamps acquired a new plant location, Engelsma and Pipe were sent to the new market to pursue sales rather than Zsenyuk. Additionally, while Zsenyuk was discouraged from calling on customers outside of SE Michigan, the Grand Rapids salesmen were repeatedly permitted to sell in her marketplace.

Mr. Kamps limited Zsenyuk's client interactions, but did not apply similar limitations to his salesmens' client interactions. For example, Mr. Kamps told Zsenyuk that he was not comfortable with her taking clients out to lunch or entertaining them - especially male clients. When Zsenyuk had the opportunity to meet with Amish mills, Mr. Kamps instructed her to wear a dress to fit in and strongly questioned whether an Amish man would even be receptive to "a woman doing a man's job."

10

Kamps used software to track the salesperson assigned to a certain account. Consequently, an account could be in someone's name indefinitely, even if they had not made any contact with the customer for years. An account under a certain salesperson's name was rendered "unaccessible" to the remaining salespeople and they were prevented from calling on the customer. Additionally, if a sale  was made with an account, the assigned sales representative received the commission even if the representative had nothing to do with the sale. Zsenyuk told Kearly that it was frustrating to drive by numerous accounts in her territory that she could not call on because they were "unaccessible." Kearly told Zsenyuk to put together a list of individuals she was prohibited from calling on and he would support her argument for access to these accounts. Zsenyuk followed Kearly's instructions, however she received no support. Instead, McMillan was permitted to call and sell to Faygo, a company that had been under salesperson Gene DeBoer's name for years. Yet, the previous year Zsenyuk was denied permission to contact and sell to Faygo.

Crossover issues arose at Kamps when two salespeople went head to head claiming the rights to an account. Throughout her ten years with Kamps, Zsenyuk never won a crossover issue. Instead, Mr. Kamps consistently sided with the male counterpart who was opposing Zsenyuk. In the case of Contact Steel, Mr. Kamps went so far as to insinuate that Zsenyuk was not trustworthy because of her religious background. Mr. Kamps told Zsenyuk that he was siding with Engelsma because Engelsma was a "church going man" and therefore Kamps knew he would not lie.

11

While Defendants assert that Zsenyuk and McMillan are not similarly situated employees because of McMillan's superior sales performance, Zsenyuk bases their dissimilarity on the fact that McMillan was held to a completely different set of rules and standards than she was. Unlike Zsenyuk, McMillan was encouraged to seek business in other markets, including those out of state, and was allowed to sell pallets wholesale while Zsenyuk was not. McMillan often sold so many pallets wholesale that Zsenyuk was left without sufficient available product to quote, let alone sell, at retail prices.

Unlike Zsenyuk, Stout's termination, although similarly termed as a dismissal based on poor performance, was handled completed differently. Helen Prindle ("Prindle"), Kamps sole Human Resources employee, was always included in the decisional process concerning employee terminations. However, Prindle was not notified of Zsenyuk's termination until after the fact. In Stout's case and prior to his dismissal, his manager called multiple times to complain about Stout's lack of performance. Stout was given a specific amount of time to improve his performance, and other salespeople were asked to reach out to him and offer help, however Stout was not receptive and his performance did not improve. Prindle was heavily involved in Stout's termination. Additionally, unlike Stout's and other terminations, Zsenyuk had no discipline file and Prindle was unaware of the company's purported dissatisfaction with Zsenyuk's performance prior to her termination.

When the aforementioned evidence is looked at in a light most favorable to Zsenyuk, it is clear that a jury could find Defendants' actions and attitudes amounted to unlawful discrimination in violation of Title VII and MELCRA. Based on the foregoing, the Court agrees with Plaintiff and concludes that Plaintiff has presented ample evidence from which

the jury could collude that her termination occurred under circumstances giving rise to an inference of unlawful discrimination.

Moreover, Zsenyuk claims Mr. Kamps allowed his religious convictions to negatively influence the way he treated her on a professional level and during meetings, he made it clear he did not think she was capable of being aggressive about sales like her male counterparts. He belittled her and attempted to push her out of his "mens-club" sales group by repeatedly addressing emails to the "men" or "gentlemen" and making inappropriate comments that singled her out based on her gender. For instance, during a sales meeting Mr. Kamps announced Zsenyuk's upcoming wedding , stating her live-in fiancé was "making an honest woman out of her" given her pregnant state.

### C.    Purported Reason for Zsenyuk's Termination

If the Court finds that Zsenyuk has successfully proven a prima facie case of discrimination, the burden then shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. *Raytheon v. Hernandez*, 540 U.S. 44, 53-54 (2003). Defendants' "explanation must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden...then the presumption raised by the prima facie case is rebutted." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-256 (1981). There is no requirement that the defendant disprove the plaintiff's claim. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

Defendants argue that Zsenyuk knew she was an at-will employee, meaning that her employment could be terminated at any time and for any reason, and that it is typical for Kamps to terminate sales reps for continuous declining sales or failing to bring in new

13

accounts. It is an undisputable fact that Zsenyuk's sales were declining. The Sixth Circuit has held, that in the sales context, an employee's "failure to develop appropriate client contacts, to develop new business, to meet her quota on a regular basis, and to make efforts to bring in sales" is a legitimate, nondiscriminatory reason for termination. *Succarde v. Federal Express Corp.*, No. 03-1227, 2004 U.S. App. LEXIS 16267, *338 (6th Cir. Aug., 4 2004).

If the court finds that Defendants have successfully rebutted Zsenyuk's claim of discrimination, the burden shifts back to Zsenyuk to establish that Defendants' reasoning was a pretext for discrimination. A plaintiff's ultimate burden is to prove discrimination through direct or circumstantial evidence to a sufficiency that a reasonable trier of fact could conclude that discrimination was a motivating factor for the adverse action taken by the employer towards the plaintiff. *Dubey v. Stroh Brewing Co.*, 185 Mich. App. 561, 565-66 (1990). Speculation or assumption is not enough to create or support a reasonable inference of pretext. *Cly v. United Parcel Service Inc.*, 501 F.3d 695. 704-705 (6th Cir. 2007).

In the instant case, the Court concluded that Zsenyuk's evidence establishes that at the very least, a question of fact exists with respect to whether or not Defendants' reason for firing Plaintiff is pretext for unlawful discrimination. Additionally, the case law demonstrates that summary judgment is inappropriate here given the compelling facts presented by Plaintiff.

For instance, in *Tabenske v. NSO, Inc.,* No. 07-CV-12594, 2009 WL 36482 (E.D. Mich. Jan. 6, 2009), a seasoned female salesperson was purportedly fired for failing to

14

meet her sales quotas. *Id.* at *5. The plaintiff provided evidence of the preferential treatment given to her male colleagues and argued that she was treated differently with respect to sales quotas and relief from meeting sales quotas because of her gender. *Id.* at *6-7. When the plaintiff's supervisor learned she was pregnant he stated that she should stay home and take care of her children. *Id.* at *5. Base on these facts, the district court held that questions of material fact existed as to whether the plaintiff was treated differently than her male colleagues and consequently summary judgment was improper. *Id.* at *7.

Likewise, in *Grassmyer v. Shred-It*, 392 Fed. Appx. 18 (3d Cir. 2010), the Federal Court of Appeals for the Third Circuit reversed a decision granting summary judgment in favor of the defendant employer, a Title VII case wherein three female sales representatives were allegedly fired for failing to meet their sales quotas. *Id.* at 20. The plaintiffs never denied their failure to meet the quotas set by their employer, but argued they were discriminated against based on gender in regards to the enforcement of quotas, training, assignment of territories, discipline, and a "mens-club" atmosphere. *Id.* at 25.

Finally, in *Stokes v. Xerox Corporation*, No. 05-71683, 2008 WL 2109576 (E.D. Mich. July 23, 2007), the district court denied summary judgment to Xerox despite evidence that the plaintiff's performance was largely unsatisfactory during her four years of employment and management involved in the plaintiff's termination were women. *Id.* at *3. The *Stokes* court based its determination on the fact that evidence pointed to a certain Caucasian male sales representative, who received unwarranted favoritism to the plaintiff's detriment with respect to performance related discipline. *Id.* at *1.

The facts of this case are analogous to those of *Tabenske*, *Grassmyer*, and *Stokes*.

15

Zsenyuk is a female employee who was terminated for the plausible reason of declining sales. However, she has presented ample evidence from which the jury could conclude Defendants' reason for firing her is pretext for unlawful gender and religious discrimination. In addition to the aforementioned facts establishing Defendants different treatment of Zsenyuk compared to her male counterparts, Defendants' argument with respect to her decreasing sales is substantially underminded by the major account she had in progress at the time of her termination. Finally, while Defendants repeatedly argue that Zsenyuk knew what her job was and failed to do it, the facts presented by Zsenyuk suggest Defendants are primarily responsible for Zsenyuk's struggle to improve her sales. Therefore, Defendants are not entitled to summary judgment.

## III.   CONCLUSION

For the above stated reasons, Defendants' Motion for Summary Judgment [#29] is DENIED.

SO ORDERED.

Dated: November 4, 2013                    /s/Gershwin A Drain_____ ___
                                           GERSHWIN A. DRAIN
                                           UNITED STATES DISTRICT JUDGE


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 4, 2013, by electronic and/or ordinary mail.

/s/ Tanya Bankston
Deputy Clerk